UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TIMOTHY KYLE PRINCE,

        Petitioner,

                                   Case No. 13-11594

v.                                     HON. AVERN COHN

SHANE JACKSON,

        Respondent.

_____/


**MEMORANDUM AND ORDER DENYING PETITION FOR A WRIT OF
HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**


I. Introduction

    This is a habeas corpus case under 28 U.S.C. § 2254. Petitioner Timothy Kyle, a

state prisoner proceeding pro se, challenges his convictions for first-degree murder,

kidnapping, armed robbery, and burning personal property. Petitioner was tried before

a jury on charges that he kidnapped, robbed, and stabbed or slashed to death an 87-

year-old woman on March 7, 2009, and then burned her truck. He raises ten (10)

claims for relief. Respondent says Petitioner's claims are time barred, procedurally

defaulted or lack merit. The Court agrees. Accordingly, the petition will be denied. The

reasons follow. Because of the number and complexity of the claims, a detailed

discussion of the evidence at trial and applicable law is necessary.

II. Background

A. Evidence at Trial

The Michigan Court of Appeals accurately summarized the evidence at trial as follows:

Defendant first met the victim about two weeks before her death, was seen at the victim's house on the day of her disappearance, and lived directly across the street from the victim. When the victim and her daughter, Dorothy Wonsey, initially met defendant sometime between February 18, 2009, and March 1, 2009, defendant asked the victim for a ride to the drug store. But as Wonsey recollected, the victim asked Wonsey to drive defendant because the victim "was scared." The victim later told Wonsey that she felt "very uncomfortable" about defendant and, "I'm not going to let him in the house. I don't want him at my house." In the victim's last contact with her other daughter, Joanne Pagan, who met defendant for the first time on March 7, 2009, the victim voiced concern about defendant's "nosey" nature and his comment about the victim having been left "well off." The victim's two daughters and son-in-law all testified that after having met defendant shortly before the victim's disappearance, they repeatedly urged the victim to keep her doors locked and to call one of them for assistance if defendant appeared at her home asking for anything. According to the victim's relatives, the victim agreed to this method of operation. On two occasions during the week or so before the victim's disappearance, she did call either Joanne Pagan or Everett Pagan to advise them that defendant had come to her house seeking a ride.

Other evidence connected defendant to the victim's house, like the presence of a couch armrest cover in the portion of the victim's driveway where she always parked her pickup truck, an armrest cover identical to the one on a couch in defendant's residence across the street, which was missing one of its armrest covers when the police searched the house on March 9, 2009. Dog tracking testimony confirmed that a police dog had followed a scent trail from the victim's porch, to the armrest cover in her driveway, to cut telephone wires at the rear of the victim's house, and back across the street to defendant's front porch. The aforementioned evidence all combined to give rise to reasonable inferences that defendant had cut the victim's telephone wires before she could call for help, entered her house, gagged the victim with the armrest cover, and transported the victim away from her house while driving her pickup truck. The evidence further substantiated that defendant drove the victim in her pickup truck to the Orchard Trail, where he eventually threw the victim's body into a creek or ditch.

> The record concerning the scene inside the victim's house lent further circumstantial support to the jury's finding that the victim accompanied defendant out of her house against her will. The testimony of the victim's daughters and son-in-law confirmed as highly uncharacteristic the condition in which the Pagans and the police discovered the victim's house on March 8, 2009. The victim had left a pan of cooked hamburger on the stove; her kitchen and living room lights and a television and coffee pot were all left on. The victim had also left the house without her purse or either of two hats that she habitually wore.

People v. Prince, No. 296922, 2011 WL 4375109, at *3–4 (Mich. Ct. App. Sept. 20, 2011).

Additional evidence was presented at trial came from Gregory and Brenda Rushlow. They testified that they dropped off Rushlow's sister, Cathy Manty, at Manty's home about 10:30 p.m. on March 7, 2009. On their way out of Manty's driveway, they saw a man, who hurried back to an old truck when he saw them and then drove away. Three days later, they viewed a photographic array and identified Petitioner as the man they had seen on the night of March 7, 2009.

Deanna Gordy and Charles McClure each testified that they saw a burning truck on 32 Mile Road[1] after 10:00 p.m. on March 7, 2009. They also saw a man, or possibly a large woman, walking alongside the road not far from the burning truck. Gordy said that the person was wearing dark clothing. McClure described the man's clothes as "army-style fatigues."

---

[1] Both Petitioner and the victim lived on 32 Mile Road.

Deputy Sheriff Jonathan Ramlow testified that he responded to the truck fire about 10:50 p.m. that night. The truck was about a quarter mile from the victim's home. The Macomb County Sheriff's Department determined the owner of the truck, but the dispatcher was unable to reach the owner by telephone after the truck was discovered.

The jury also heard the following timeline as to the events leading up to Petitioner's arrest. The victim's son-in-law Everett Pagan reported the victim missing on Sunday, March 8, 2009. Upon receipt of this information, employees of the Macomb County Sheriff's Department compared information that they had received about the burning truck to information about the missing victim and determined that the missing victim was the owner of the burned truck. Later that day, Macomb County Deputy Sheriff Timothy Davis met Pagan at the victim's home where Pagan pointed out things that seemed odd or out of place, such as a tire track alongside the driveway, lights and appliances that had been left on, and a rag or armrest cover where the victim normally parked. The canine search leading from the armrest cover on the victim's property to Petitioner's home occurred on the same day.

On Monday, March 9, 2009, Michael Jarosz noticed the victim's body in a ditch as he was biking on the Macomb Orchard Trail. Macomb County Sergeant David Kennedy estimated that the body was two and half to three miles from the victim's home. There was a cocked and loaded flare gun underneath the victim's body and a beer can nearby; the beer can did not appear to be related to the crime.

On March 9 or 10, 2009, Deputy Sheriff Christopher Land found a flare gun shell and a small folding pocket knife in a sports coat pocket in Petitioner's home. The flare was unusual because it had white packing on the tip. Detective Sergeant David Willis compared the flare gun shell found near the victim's body with the one found in Petitioner's house and determined that they had been altered in similar ways.

On March 10, 2010, Macomb County Deputy Sheriff Sharon Furno found a camouflage jacket and two matching boots in a ditch not far from Petitioner's home on 32 Mile Road. On March 11, 2009, a search team found a filet knife about twenty-five feet from where the victim's body was found.

Regarding the victim's manner of death, Dr. Daniel Spitz performed the autopsy on the victim and testified that the victim's most significant injury was an incised wound that cut through her jugular vein. He testified that the victim also suffered from multiple stab wounds of the chest and abdomen, and she had defensive knife wounds on her hands and forearms. The cause of death was stab wounds of the abdomen and the incised wound of the neck; the manner of death was homicide. Dr. Spitz opined that a basic filet knife could have made the victim's wounds.

Additional evidence linking Petitioner to the crime came from the testimony of Eric Shuman. He testified that he knew Petitioner from having worked with him in 2007. He claimed that Petitioner once showed him a flare gun like the one in evidence. Petitioner told him at the time that he modified the flare gun shells by putting BB's from shot gun shells into the flares to make it a shotgun/flare mixture.

Shuman further testified that he met Petitioner again in jail in 2009 where Petitioner told him about the murder case. Petitioner informed him that the prosecution's case was fake and that the lady who lived with him committed the crime with the victim's son or son-in-law and then threw his clothes in a ditch. Shuman admitted that, in return for his cooperation with the prosecution, he was released from jail two or three days early and was given an extra ninety days to pay a fine.

Finally, Sandra Berry testified that she rented a house across the street from the victim's home and that Petitioner and his son were leasing rooms from her in March of 2009. She testified that on Saturday, March 7, 2009, about 9:10 p.m., Petitioner left the house wearing a camouflaged hat, jacket, and boots. She could not recall whether his pants also were camouflaged or whether they were blue jeans. Petitioner stated that he was going to the nearby party store, but he returned about 10:30 or 10:45 p.m.

Berry also identified the jacket, boots, flare gun, knife, and armrest cover in evidence as items that belonged to Petitioner or that she had seen in the house which she shared with Petitioner. Berry also denied dating or conspiring with Everett Pagan to kill the victim. She also denied conspiring with anyone to remove Petitioner from the house.

The defense presented several witnesses and argued to the jury that there were plenty of things that should cause the jury to have reasonable doubt in the case.

## B.  Procedural History

On January 22, 2010, the jury found Petitioner guilty, as charged, of premeditated murder, M.C.L. § 750.316(1)(a), felony murder, M.C.L. § 750.316(1)(b), kidnapping, M.C.L. § 750.349, armed robbery, M.C.L. § 750.529, and arson of personal property valued at $1,000 to $20,000, M.C.L. § 750.75(1)(a)(i).  The trial court sentenced Petitioner as a habitual offender to concurrent terms of life imprisonment without any possibility of parole for the two murder convictions, twenty-five to sixty years in prison for the kidnapping and armed robbery convictions, and three years, four months to seven and a half years for the arson conviction.

On direct appeal, Petitioner argued through counsel that (1) his double jeopardy rights were violated when he was convicted of two counts of first-degree murder for the death of one victim, (2) there was insufficient evidence of kidnapping, and (3) the trial court erred by failing to give the standard jury instruction on dog tracking, and defense counsel was ineffective for failing to object.  In a pro se supplemental brief, Petitioner raised issues about in-court identifications of him, the prosecutor's conduct, the admission of certain evidence, and his absence from a suppression hearing.  The Michigan Court of Appeals affirmed Petitioner's convictions, but remanded the case so that Petitioner's judgment of sentence could be amended to reflect a single conviction and sentence for first-degree murder, supported by two different theories.  See Prince, 2011 WL 4375109, at *1 and *12.

In a pro se application for leave to appeal in the Michigan Supreme Court, Petitioner raised claims about the in-court identifications, the lack of counsel at the photographic show-ups, and the prosecutor's conduct. The Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. See People v. Prince, 809 N.W.2d 591 (Mich. 2012).

Petitioner filed this action on April 9, 2013, Doc. 1, but later moved to hold the petition in abeyance while he pursued additional state remedies. See Doc. 7. The Court granted the motion and closed this case for administrative purposes. See Doc. 10.

Petitioner subsequently moved to reinstate his habeas corpus petition and to have the Court adjudicate the claims listed in his habeas petition. See Doc. 16. The Court granted Petitioner's motion and directed Respondent to answer the petition. See Doc. 17. Before Respondent's answer was due, Petitioner moved for a second stay so that he could pursue state remedies. See Doc. 19. The Court granted the motion. See Doc. 20.

Petitioner then filed a motion for relief from judgment in the trial court. He argued that the trial court deprived him of his right to present a defense, that the prosecutor committed misconduct, that the investigating officers mishandled evidence, and that his trial and appellate attorneys were ineffective. The trial court rejected Petitioner's claims. See People v. Prince, No. 2009-002294-FC, Op. and Order (Macomb Cty. Cir. Ct. Sept. 1, 2015). The Michigan Court of Appeals denied leave to appeal the trial court's

decision "for lack of merit in the grounds presented." <u>See</u> <u>People v. Prince</u>, No. 331823 (Mich. Ct. App. May 20, 2016). The Michigan Supreme Court denied leave to appeal because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D). <u>See</u> <u>People v. Prince</u>, 888 N.W.2d 81 (Mich. 2016).

Petitioner returned to this Court on February 15, 2017, with an amended habeas petition containing ten grounds for relief (Doc. 22) and a motion to re-open this case (Doc. 21).

### III. Standard of Review

28 U.S.C. § 2254(d), provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.' "

Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case."  Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly,

> [w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Harrington, supra, at 102–103, 131 S.Ct. 770 (internal quotation marks omitted).

Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

In simple terms, the Supreme Court has said that the standard of review is "difficult to meet" and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Richter, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). The Supreme Court has further said that a federal court must guard against "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010).

Finally, a federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV. Statute of Limitations

As an initial matter, Respondent argues that Petitioner's first three claims are barred by the statute of limitations. The statute of limitations defense is not jurisdictional, because "[i]t does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.' " Holland v. Florida, 560 U.S. 631, 645 (2010) (quoting Day v. McDonough, 547 U.S. 198, 205, 208 (2006)). "[A] procedural default, that is, a critical failure to comply with state procedural law, [also] is not a jurisdictional matter." Trest v. Cain, 522 U.S. 87, 89 (1997). In the interest of efficiency, therefore, the Court goes directly to the merits of Petitioner's claims.

V.  Petitioner's Claims

A. Double Jeopardy

In his first ground for relief, Petitioner says that his constitutional right not to be placed in double jeopardy was violated when he was convicted and sentenced for two homicides involving one victim.  Petitioner raised this claim in his appeal of right.  The Michigan Court of Appeals resolved the problem by remanding Petitioner's case for correction of the judgment of sentence to reflect one conviction and sentence for first-degree murder, supported by two different theories.  <u>See</u> <u>Prince</u>, 2011 WL 4375109, at *1 and *12.  Because Petitioner was granted the relief he seeks, his claim is moot, and he concedes this in his reply brief.  <u>See</u> Doc. 26, page 6.  Thus, there is no basis for granting relief on his claim.

B.  Insufficient Evidence

Petitioner claims next that there was insufficient evidence at trial to support his kidnapping conviction.  Petitioner contends that there was no evidence that the victim did not go willingly to the truck with him, and he argues that there may have been an intervening cause of death, such as a dispute in the truck. The Michigan Court of Appeals adjudicated this claim on the merits on direct appeal and concluded that the elements of the offense were satisfied.

1.  Federal Law

The Supreme Court has held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Following Winship, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted) (emphases in original).

The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  Coleman v. Johnson, 566 U.S. 650, __, 132 S. Ct. 2060, 2062 (2012) (per curiam).  First, it is the responsibility of the jury to decide what conclusions should be drawn from the evidence admitted at trial.  Id. (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)).   "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because

the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " Id. (quoting Smith, 565 U.S. at 2); see also Tanner v. Yukins, __ F.3d __, __, No. 15-1691, 2017 WL 3481867, at *9 (6th Cir. Aug. 15, 2017) explaining that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court").

2.  Application

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  Jackson, 443 U.S. at 324 n.16.  As charged in this case, the prosecutor had to prove that Petitioner knowingly restrained the victim with the intent to hold her for ransom or reward and without her consent or without legal authority.  M.C.L. § 750.349(1)(a).  The term "restrain" means "to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority."  Mich. Comp. Laws § 750.349(2).

A rational juror could have concluded from the evidence summarized in section II.A. of this opinion that Petitioner forced or coerced the victim to leave her home and then restrained her in her own truck and interfered with her liberty without her consent or legal authority.  As for Petitioner's intent, there was evidence that, on

> [t]he night [Dorothy] Wonsey met defendant and drove him to a drug store,
> defendant mentioned to Wonsey, "Well, your dad must have left your
> mother well off. . . .  You know that truck is worth a lot of money. . . ."  On

14

March 7, 2009, the last time the Pagans saw the victim, Everett Pagan
remembered that as he drove defendant to a gas station and drug store,
defendant "kept remarking about how nice my truck was, how nice my
Fifth Wheel is," and told Pagan that he "used to own stuff." Joanne Pagan
similarly remembered defendant mentioning, "Oh, you have a nice house,
you have a nice vehicle. I used to have money at one time." Joanne
Pagan additionally testified that the last time she saw the victim on March
7, 2009, the victim voiced concern about defendant's "nosey" nature and
his comment about the victim having been left "well off."

Prince, 2011 WL 4375109, at *4. A rational juror could have concluded from this

evidence that Petitioner intended to restrain the victim to gain money or possessions.

Although Petitioner suggests that the victim might have gone with him willingly,

the record indicates that she was afraid of Petitioner and previously had declined to take

him places in her truck because she was uncomfortable around him. Additionally, she

left her lights, coffee pot, and television on when leaving, and her hat and purse were

inside the house even though she typically never left home without those items. These

are indications that her departure was sudden and involuntary.

Petitioner also claims that some intervening cause may have resulted in the

victim's death, but the victim had defensive injuries on her hands and forearms, she had

been stabbed multiple times, and her throat was slashed. These wounds ruled out the

possibility that some intervening cause, such as a minor dispute in the truck, an

accident, or some pre-existing health issue caused the victim's death.

The evidence was sufficient to sustain Petitioner's conviction for kidnapping, and

the state appellate court's conclusion that the elements of kidnapping were satisfied

was not contrary to, or an unreasonable application of, <u>Jackson</u>. Petitioner is not entitled to relief on the basis of his challenge to the sufficiency of the evidence supporting his kidnaping conviction.

## C. Jury Instruction/Ineffective Assistance of Counsel

The third ground for relief alleges that Petitioner is entitled to a new trial because the trial court failed to read the standard criminal jury instruction on tracking dogs, even though there was testimony that a tracking dog followed the victim's scent from her house to Petitioner's home across the street. (1/15/10 Trial Tr. at 66-81). Petitioner further alleges that trial counsel was ineffective for failing to request the instruction.

Petitioner's claim about the jury instruction lacks merit. As the Michigan Court of Appeals pointed out on direct appeal, the trial court <u>did</u> read a jury instruction on tracking dogs, and according to the Court of Appeals, the instruction paralleled the standard jury instruction on tracking dogs as it read then. Furthermore, the instruction tended to favor Petitioner because it stated:

> You have heard testimony about the use of a tracking dog. You must . . . consider tracking dog evidence with great care and remember that it has little value as proof. Even if you decide that it is reliable, you must not convict the Defendant based only on tracking dog evidence. There must be other evidence that the Defendant is guilty.

(1/22/10 Trial Tr. at 89-90.)

Because this instruction adequately protected Petitioner, he is not entitled to a new trial, and defense counsel was not ineffective for failing to object to the trial court's instruction. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2013). Petitioner is not entitled to relief on this ground.

## D. In-Court Identifications

Petitioner contends that the Rushlow's in-court identifications of him as the man they saw on the night of the crime should have been suppressed because the pretrial identifications were based on unnecessarily suggestive photographic show-ups. Petitioner also contends that the in-court identifications were inherently unreliable. The Michigan Court of Appeals disagreed and concluded from the totality of the evidence that the photographic showing where the Rushlows identified Petitioner was not unduly suggestive and that the Rushlows' identifications of Petitioner at trial were reliable.

### 1. Federal Law

An identification procedure violates due process of law if the confrontation was "'unnecessarily suggestive and conducive to irreparable mistaken identification.'" Neil v. Biggers, 409 U.S. 188, 196 (1972) (quoting Stovall v. Denno, 388 U.S. 293, 301-02 (1967)). In a case where witnesses made in-court identifications after viewing a photographic array, the Supreme Court held

that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Simmons v. United States, 390 U.S. 377, 384.  Thus, "[i]t is . . . apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' "  Biggers, 409 U.S. at 198 (quoting Simmons, 390 U.S. at 384.

Courts in this Circuit follow a two-part analysis when determining whether an identification is admissible.  Id.

> The court first considers whether the procedure was unduly suggestive. Wilson v. Mitchell, 250 F.3d 388, 397 (6th Cir. 2001); Ledbetter v. Edwards, 35 F.3d 1062, 1070-71 (6th Cir. 1994).  The court must decide if the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection.  Wilson, 250 F.3d at 397. "The defendant bears the burden of proving this element." Ledbetter, 35 F.3d at 1071 (citation omitted).  If the procedure was suggestive, the court then determines whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible.  Wilson, 250 F.3d at 397 (citation omitted); Ledbetter, 35 F.3d at 1071.

Cornwell v. Bradshaw, 559 F.3d 398, 413 (6th Cir. 2009).  The following five factors must be considered when determining whether an identification was reliable despite its suggestiveness:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200.

2.  Application

There were two photographic showings in this case: one on Monday, March 9, 2009, and one on Tuesday, March 10, 2009.  On March 9, a detective went to the Rushlows' home and gave both Gregory and Brenda Rushlow a sheet of paper with six photographs on it.  The Rushlows were seated at opposite ends of their kitchen table, and they were told not to share any information with each other while they were looking at the photographs.  They were also told that the suspect may or may not be in the array.  (1/13/10 Trial Tr. at 198-206.)

Mr. Rushlow looked at the photos for three to five minutes and then told the detective that he had narrowed his choice to two individuals, but that he could not be completely sure whether it was one or the other.  He did not tell the detective which individuals he was considering.  (Id. at 206.)  Mrs. Rushlow also thought that two men in the photographs might have been the man she and her husband had seen on March 7, 2009, but she did not select anyone in the array because she wanted to be sure of her identification.  (1/14/10 Trial Tr. at 30-32.)

On the following day, March 10, 2009, a different detective showed the Rushlows another set of six photographs, including an updated picture of Petitioner.  The detective said that he thought the person they had seen on March 7, 2009, was in the array.  Mr. Rushlow recognized Petitioner in the array immediately.  The detective then stated that he had picked the right person.  Mr. Rushlow nevertheless claimed at trial that nothing the detective said influenced his decision.  Instead, he recognized Petitioner's face and facial expression; he was influenced by how accurately the picture depicted the person he had seen on March 7, 2009.  (1/13/10 Trial Tr. at 209-215, 228.)

Mrs. Rushlow took about five seconds to identify Petitioner in the second array. (1/14/10 Trial Tr. at 39.) The detective then told her that the police had the man in custody. Id. at 40, 55.

Considering the above, the Court agrees with the Michigan Court of Appeals that there was nothing inherently suggestive about the photographic arrays, and even though a detective told the Rushlows that a suspect was in the second array, this did not necessarily render the procedure unduly suggestive. This is particularly true when, as here, the witnesses promptly and unequivocally identified the suspect and were not told which person the police thought was the suspect.

Moreover, telling the Rushlows after the second viewing that they picked the right person and that the person was in custody also did not make the pretrial procedure suggestive because the Rushlows, of course, had already identified Petitioner by then. The comment likely did affect the Ruslows' subsequent identifications of Petitioner at trial, but their in-court identifications of Petitioner were reliable despite the suggestive comment. They saw Petitioner on March 7, 2009, from a distance of about sixteen to twenty feet. He was plainly visible in the headlights of their vehicle, and there were no obstacles blocking their view. They looked directly at Petitioner's face for fifteen to twenty seconds when they initially confronted him and for a few additional seconds after Petitioner entered the truck he was using and the interior light came on.

The Rushlows were not distracted when they observed Petitioner, and their degree of attention obviously was good because they noticed that he had his hands in

his pockets, that he shuffled from one side of the driveway to the other side, and that he was "stooped" or hunched over slightly. In addition, they were able to describe his clothing, his features, and his facial expression.

Mr. Rushlow described the man's weight as significantly less than what Petitioner apparently weighed at the time, but they both described Petitioner as stocky, stout, or husky, and their description apparently was accurate in other ways, too. They were certain of their identification at the second show-up and at trial, and the length of time between their confrontation with Petitioner and the second photographic showing was short: from about 10:30 p.m. on Saturday, March 7, 2009, to Tuesday, March 10, 2009.

The Court finds that the photographic arrays were not unnecessarily suggestive or conducive to mistaken identification and that the Rushlows' in-court identifications of Petitioner were reliable. Further, the state appellate court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, Biggers. Petitioner is not entitled to habeas relief based on the Rushlows' identifications of him.

### E.  Right to Counsel

The fifth ground for relief alleges that Petitioner's right to counsel was violated when the photographic showings on March 9, 2009, and March 10, 2009, were conducted in the absence of counsel. Although no state court addressed this issue on the merits, there is no right to counsel at a photographic showing used to allow a witness to identify a suspect. United States v. Ash, 413 U.S. 300, 321 (1973). Thus,

Petitioner's claim lacks merit.  Petitioner concedes he is not entitled to relief on this ground.  <u>See</u> Doc. 26, page 7.

### F.  Prosecutorial Misconduct Regarding Sandra Berry

The sixth ground for relief alleges prosecutorial misconduct.  Petitioner contends that the prosecutor violated his right to due process by failing to correct Sandra Berry's false testimony that (1) she had no prior felony conviction, (2) Petitioner owned a red knife and not a brown knife, as she informed the police, and (3) Petitioner was wearing camouflage clothing on the night of the crime, not blue jeans as she stated at the preliminary examination.  The Michigan Court of Appeals reviewed Petitioner's prosecutorial misconduct claim for "plain error" affecting Petitioner's substantial rights because Petitioner did not preserve his claim by making an appropriate objection at trial.

Petitioner essentially argues that the prosecutor suborned perjury.  Prosecutors may not deliberately deceive a court or jurors by presenting false evidence; nor may they allow false evidence to go uncorrected when it appears.  <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972).  But to prevail on a claim that the prosecution presented false testimony or allowed it to go uncorrected, Petitioner must show that (1) the disputed statements were actually false, (2) the statements were material, and (3) the prosecutor knew the statements were false.  <u>Amos v. Renico</u>, 683 F.3d 720, 728 (6th Cir. 2012).  Petitioner must demonstrate that the statements were "indisputably false," not simply misleading.  <u>Byrd v. Collins</u>, 209 F.3d 486, 517 (6th Cir. 2000).  Additionally, "mere

inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989).

Petitioner claims that prosecution witness Sandra Berry lied when she denied being convicted of a felony. However, as the Michigan Court of Appeals pointed out in the appeal by right, Berry was not asked about her criminal history at trial. Petitioner has failed to show that Berry lied at trial about never having been convicted of a felony.

Petitioner next says that Berry lied when she testified that he owned a filet knife with a red handle and not a brown handle as she initially told the police. A deputy sheriff involved in the case described the handle of the filet knife found near the victim's body as maroon, auburn, or red. (1/13/10 Trial Tr. at 115.) A different deputy sheriff described the knife handle as brown or reddish. (1/19/10 Trial Tr. at 85.) And a third officer described the knife handle as "maybe burgundy." (1/21/10 Trial Tr. at 154.)

In light of these differing descriptions of the knife by independent observers, it is far from clear that Berry lied about the knife. She maintained at trial that the knife in evidence was the same knife that she had seen at the house which she shared with Petitioner. (1/21/10 Trial Tr. at 70-71.)

Petitioner also has failed to show that Berry lied about the pants he was wearing on the night of the crime. Berry testified that she did not recall whether Petitioner wore blue jeans or camouflaged pants on the night of the murder. Id. at 38. She testified similarly at the preliminary examination. (5/20/09 Prelim. Examination Tr. at 38-39.)

In sum, even assuming that Berry's comments were material, Petitioner has failed to show that the comments were actually false and that the prosecutor knew the comments were false. Petitioner's perjury claim fails.

## G. Right to a Defense

Petitioner states that he was deprived of his right to present a defense because the trial court prevented him from presenting testimony that Berry may have had sexual relations with his twelve-year-old son.

### 1. Federal Law

Defendants in criminal prosecutions are entitled to "a meaningful opportunity to present a complete defense." <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984). The Supreme Court, however, has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability – even if the defendant would prefer to see that evidence admitted." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973)). As explained in <u>United States v. Scheffer</u>, 523 U.S. 303 (1998),

> [a] defendant's right to present relevant evidence is . . . . subject to reasonable restrictions. A defendant's interest in presenting such evidence may thus " 'bow to accommodate other legitimate interests in the criminal trial process.' " As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve."

24

Id. at 308 (internal and end citations and footnote omitted).

"While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South Carolina, 547 U.S. 319, 326 (2006). And a federal habeas "court's duty 'is not to determine whether the exclusion of the evidence by the trial judge was correct or incorrect under state law, but rather whether such exclusion rendered petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights.' " Lewis v. Wilkinson, 307 F.3d 413, 420 (6th Cir. 2002) (quoting Logan v. Marshall, 680 F.2d 1121, 1123 (6th Cir. 1982)).

## 2. Application

Petitioner's claim arose during trial when he sought permission to present a psychologist who interviewed Petitioner's son and thought that something improper might have happened between Petitioner's son and Berry. Although Petitioner's son apparently denied being sexually abused by Berry, Petitioner wanted to use the psychologist's testimony to impeach Berry's credibility and to show that she wanted Petitioner out of the house. The state trial court declined to grant Petitioner's request on the basis that Ms. Berry was not on trial. (1/13/10 Trial Tr. at 28-32.)

Petitioner subsequently argued in his post-conviction motion, that the trial court's ruling deprived him of his right to present a defense. The trial court ruled that the testimony was properly excluded under Michigan Rule of Evidence 608(b), which generally prohibits the use of extrinsic evidence of specific instances of conduct to attack a witness's credibility.[2] The trial court found that the proffered testimony by the psychologist was speculative, that it was collateral to Berry's character for truthfulness, and that it did not prejudice Petitioner's ability to present evidence relevant to his guilt or innocence.

The Court agrees with the trial court. The psychologist's testimony would have been speculative because Petitioner's son apparently denied being abused when he was questioned by the psychologist and by staff at a children's advocacy center. (1/13/10 Trial Tr. at 30.) The psychologist's testimony could have distracted or

---

[2] The Rule reads:

Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided by Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Mich. R. Evid. 608(b).

confused the jury by raising a collateral issue.  Furthermore, Petitioner had a sufficient opportunity to impeach Berry's testimony at trial, and Berry was candid about her dislike and mistrust of Petitioner.  Thus, the jury was able to assess Berry's credibility and motive for testifying against Petitioner without the psychologist's testimony.  As such, Petitioner was not deprived of his constitutional right to present a defense.

## H.  Additional Prosecutorial Misconduct

The eighth ground for relief raises additional claims of prosecutorial misconduct. Petitioner contends that the prosecutor (1) withheld exculpatory evidence, (2) relied on false testimony from witnesses, (3) referred to blood in the victim's truck even though no evidence of blood was introduced at trial, and (4) admitted in evidence a photographic array other than the one shown to the Rushlows.  The state trial court addressed these claims on post-conviction review and found no merit in them.

### 1.  Federal Law

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  And, as recently explained by the Sixth Circuit,

> [t]he key question . . . "is whether the prosecutor's comments [and conduct] so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quotation omitted).  Because that standard is "a very general one," courts have considerable leeway in resolving such claims on a case-by-case basis.  Parker v. Matthews, 567 U.S. 37, 48, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (per curiam).  That leeway increases in assessing a state court's ruling under AEDPA.

[Courts] "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable." <u>Trimble [v. Bobby</u>, 804 F.3d 767, 783 (6th Cir. 2015)].

<u>Stewart v. Trierweiler</u>, __ F.3d __, __, No. 16-2149, 2017 WL 3470394, at *4 (6th Cir. Aug. 14, 2017).

## 2.  Application

Petitioner contends first that the prosecutor withheld exculpatory evidence from him during the discovery phase of the case.  Petitioner claims that the prosecutor was bound by discovery rules to provide the information.

The evidence supposedly withheld included (1) the crime lab's report regarding fingerprints and DNA and (2) the victim's cell phone bill.  Petitioner asserts that, without the crime lab's report, he had no way to challenge an officer's testimony that the beer can had little evidentiary value, and he contends that any fingerprints on the gun and beer can could have led to another suspect.  Petitioner further alleges that the cell phone bill would have shown the victim had the ability to call for help.  The trial court addressed this issue on post-conviction review and concluded that the lab report would not have affected the fairness of Petitioner's trial, that the victim's cell phone records were not exculpatory evidence, and that Petitioner was not entitled to discover any of the items.

The Supreme Court has stated that there is no constitutional right to discovery in a criminal case, <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977), and the prosecutor's alleged violation of state discovery rules order is not a cognizable claim on habeas review because it is not a constitutional violation. While it is true that a prosecutor's suppression of evidence favorable to an accused can violate the person's right to due process, <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), to the extent Petitioner is raising a <u>Brady</u> claim, he must show that (1) the evidence in question was favorable to him, either because it was exculpatory or impeaching, (2) the prosecution suppressed the evidence, either willfully or inadvertently, and (3) prejudice ensued. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

Petitioner has failed to show that the evidence in question was favorable to him. Sergeant Pamela McLean testified that the beer can had no evidentiary value (1/21/10 Trial Tr. at 103) and that there were no fingerprints on the flare gun or shells (<u>id</u>. at 106.) Petitioner's claim that the forensic report about these items might have led to exculpatory evidence is based on mere speculation, which is insufficient to establish a <u>Brady</u> claim. <u>Wood v. Bartholomew</u>, 516 U.S. 1, 15 (1995).

As for the victim's cell phone bill, Petitioner claims that the bill would have shown that the victim could have called for help, despite the fact that her land line was cut. But the victim's daughter testified that the victim did not use the cell phone. (1/19/10 Trial Tr. at 9). And, as the trial court pointed out, "[p]roving that the victim had multiple ways to call for help would not disprove the evidence that her killer tried to eliminate one of

29

those ways by cutting her landline." <u>Prince</u>, Macomb Cty. Cir. Ct. No. 2009-002294-FC, Op. and Order dated Sept. 1, 2015, at 6.

Petitioner has failed to establish a <u>Brady</u> claim because the evidence in question was not favorable to him and because no prejudice ensued from the alleged suppression of the evidence.

3.

Petitioner alleges next that the prosecutor committed misconduct by using inconsistent and false testimony at trial. As alleged examples, Petitioner points to testimony by prosecution witnesses regarding (1) the location of a detective when a flare shell was found in a jacket, (2) the position of the victim's arms when her body was found, (3) Sergeant Kennedy and whether he went down the ravine and examined the flare gun found by the victim, (4) the victim's son-in-law and whether he picked up the armrest cover at the victim's home, (5) the tracking dog's range of scent detection, (6) the depth of the water near the victim's home on the weekend of the crime, (7) the last time the victim's daughter saw the victim, and (8) Gregory Rushlow's viewing of the second photographic array.

The trial court stated on post-conviction review that there was no prosecutorial misconduct in presenting this evidence. The trial court noted that Petitioner strained to find inconsistencies in the witnesses' testimony and that Petitioner belabored minor differences in the investigation officers' descriptions of the victim, the tracking dog's scene radius, and a flare shell.

Much of the disputed testimony, such as the location of certain witnesses and evidence, the tracking dog's scent-detention radius, and the depth of the water level during the rainy weekend of the crime, was inconsequential. As a result, any inconsistencies in the testimony were harmless.

Other disputed information, such as the last time a family member saw the victim and the reliability of Mr. Rushlow's identification at the second photographic array, was more important. But the victim's daughter, Joanne Pagan, made it clear that she last saw the victim on Saturday night, March 7, 2009 (1/19/10 Trial Tr. at 36), and Mr. Rushlow testified that he immediately recognized Petitioner in the second photographic array. (1/13/10 Trial Tr. at 213.) Petitioner has failed to show that these witnesses testified falsely and that the prosecutor erred by relying on their testimony.

4.

Sergeant Pamela McLean testified that a carpet sample from the victim's truck was tested and that no blood was found on it. (1/21/10 Trial Tr. at 107-08.) Petitioner alleges that the prosecutor committed misconduct when he subsequently stated during closing arguments that the victim's blood was present in her truck. (1/22/10 Trial Tr. at 39.)[3] The trial court, however, determined on post-conviction review that no reversible error occurred in the prosecutor's closing argument.

---

[3] The prosecutor was reflecting on the Rushlows' observation of Petitioner on the night of the crime. The actual comment reads:

The Court agrees. The prosecutor's disputed comment was a fleeting moment in a long trial, and, taken in context, it appears that the comment was meant to explain why Petitioner supposedly burned the truck. Cf. 1/13/10 Trial Tr. at 71 (the prosecutor's opening statement that he intended to show that Petitioner torched the victim's truck because the victim bled in the truck and he had to hide that evidence). The prosecutor was making a reasonable inference from the evidence and, therefore, his comment was not improper. United States v. Collins, 78 F.3d 1021, 1040 (6th Cir. 1996).

5.

In his final claim against the prosecutor, Petitioner alleges that the prosecutor introduced in evidence a photographic array that differed from the one the Rushlows viewed. Petitioner contends that this was a falsification of evidence. Petitioner also alleges that the photograph of him was altered to remove the sunglasses that he was wearing on the top of his head.

The trial court stated on review of this claim that there was no error in admitting the photograph. The Court agrees because Mr. Rushlow testified that the photographic

---

And it may have been . . . that an adjustment in [Petitioner's] plan was made because he is now seen, now he is identified with that truck and now there is her blood in that truck, therefore, he is a suspect. Which then means the truck has to be torched and all the evidence of him inside that truck.

(1/22/10 Trial Tr. at 39.)

arrays in evidence were the ones that he viewed. (1/13/10 Trial Tr. at 205 and 212, 229.) And even though Petitioner's photograph was modified in one of the arrays, the only modification was to digitally remove sunglasses from his head to make him resemble the other men in the photographic array and to make the array fairer. (1/21/10 Trial Tr. at 94.) There was no prosecutorial misconduct.

To conclude, the prosecutor's conduct did not deprive Petitioner of a fair trial, and the state court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, <u>Darden</u>. Petitioner has no right to relief on the basis of his claim.

## I. Ineffective Assistance/Mishandled Investigation

The ninth ground for relief raises two unrelated claims: (1) that trial counsel provided ineffective assistance by withholding evidence and by presenting false facts about witness testimony during his closing argument and (2) that investigators mishandled evidence found at the crime scenes.[4] The trial court found no merit in these claims on post-conviction review.

### 1. Mishandling of Evidence

The alleged mishandling of evidence pertains to the victim's coat and cell phone. Petitioner contends first that investigators had no authority to remove the coat from the

---

[4] The amended petition also alleges that Petitioner's Fourth Amendment rights were violated because the warrant to search his home was obtained falsely. Petitioner asserts in his reply to Respondent's answer that he is not raising a Fourth Amendment claim. The Court, therefore, considers the Fourth Amendment claim to be abandoned.

victim's body and that they failed to show that the coat fibers did not match those found on the camouflage jacket in evidence.

Whether investigators or the county medical examiner possessed authority to remove the victim's coat is a question of state law, and "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Further, any error by the prosecution in not presenting exculpatory evidence about the coat fibers was harmless in light of the substantial evidence against Petitioner.

Petitioner also blames investigators for not collecting the victim's cell phone from her home. Petitioner maintains that this amounted to spoliation of evidence, because the prosecution's theory was that the victim had no means of contacting help. The failure to preserve potentially useful evidence, however, violates a defendant's right to due process only if the police acted in bad faith. Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Here, there was no evidence that the police acted in bad faith when they chose not to collect the victim's cell phone as evidence. Petitioner has failed to show that investigators mishandled evidence. Therefore, his claim lacks merit.

### 2. Ineffective Assistance

The remaining issue is whether trial counsel was ineffective. It appears that Petitioner alleges trial counsel was ineffective for failing to utilize a videotape of the

investigation at the two crime scenes and for failing to call witnesses to testify in his behalf.

a. Federal Law

The "clearly established Federal law" for this claim is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, a defendant must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." <u>Id</u>. at 687. An attorney's performance is deficient if his or her "representation fell below an objective standard of reasonableness." <u>Id</u>. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id</u>. at 687.

The prejudice prong of the <u>Strickland</u> test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id</u>. The defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." <u>Richter</u>, 562 U.S. at 111-12 (quoting <u>Strickland</u>, 466 U.S. at 693). In a habeas case, moreover, review of an ineffective-assistance-of-counsel claim

is "doubly deferential," Cullen v. Pinholster,  563 U.S. 170, 190, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," Burt v. Titlow, 571 U.S. ——, ——, 134 S.Ct. 10, 17, 187 L.Ed.2d 348 (2013) (quoting Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); internal quotation marks omitted).  In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt."  Burt, supra, supra, at ——, 134 S.Ct., at 13.

Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam).

## b. Application

Petitioner alleges that defense counsel should have introduced videotapes of the investigation at the victim's home and the location where her body was found.  He contends that the videotapes would have contradicted law enforcement officers' account about the condition of the crime scenes and shown that the crime scenes were staged. It is more likely, however, that the videotapes would have confirmed, rather than contradicted, what law enforcement officers stated at trial.  See, e.g., 1/20/10 Trial Tr. at 12 (Deputy Sheriff Jeff Gentner's testimony that neither he, nor the medical examiner, put the flare gun under the victim's body and that the gun was not visible before the victim was rolled over).  In fact, the Michigan Court of Appeals stated on direct review that the video recordings were cumulative evidence, "given that abundant additional evidence was introduced concerning both scenes in the form of testimony, photographs, and physical evidence."  Prince, 2011 WL 4375109, at 10.  As such, trial counsel was not ineffective for failing to seek to introduce the videotapes.

Petitioner also contends that trial counsel was ineffective for failing to call certain witnesses (Cathy Manty, Sergeant Phillip Neumyer, and Dale Ezzo) because those witnesses could have established that someone else committed the crime. Petitioner argued in his post-conviction motion that: Manty could have testified about her telephone conversation with Brenda Rushlow on the night of the crime and possibly called Mrs. Rushlow's credibility into question by describing the man she (Mrs. Manty) saw in her driveway on the Saturday night, March 7, 2009; Sergeant Neumyer could have testified that he found no clothing, boots, or other evidence during a search of the area near Petitioner's home; and Dale Ezzo could have testified that he filed a concerned citizen's report, indicating that he noticed a couple of suspicious vehicles near the bike trail about 4:10 or 4:30 a.m. on the Monday after the crime.

Petitioner's allegation about what Manty would have said is pure speculation because there is no evidence that she saw the man in her driveway on Saturday night, March 7, 2009. Thus, it is unlikely that she could have discredited Mrs. Rushlow's description of the man.

Sergeant Neumyer's anticipated testimony would not have proved that investigators planted Petitioner's jacket and boots in a ditch near his home. Instead, he could have simply overlooked the evidence.

As for Mr. Ezzo, he was not certain whether he saw the vehicles on Sunday morning or on Monday morning. See Petitioner's Amended Memorandum of Law in Support of Mot. for Relief from J., Doc. 25-20, Ex. G., Page ID 2623. Even if Mr. Ezzo

could have established that it was Sunday morning or Monday morning, the evidence in the case suggested that the victim had already been murdered by then and that her own truck was used in the murder and then intentionally burned.

The Court agrees with the trial court which concluded that nothing in the witnesses' anticipated testimony supported the theory that someone else committed the crime. Defense counsel's failure to call the witnesses, therefore, did not amount to deficient performance.

Finally, Petitioner alleges that defense counsel presented false facts in his closing argument when he stated that both Deana Gordy and Charles McClure saw him on the night of the crime. Petitioner misinterprets defense counsel's remarks. Defense counsel merely stated that Ms. Gordy and Mr. McClure saw an individual or a man. He did not say that they saw Petitioner. (1/22/10 Trial Tr. at 59, 74.) This was consistent with Ms. Gordy's and Mr. McClure's testimony that, on March 7, 2009, they saw a burning truck on 32 Mile Road after 10:00 p.m. and a person walking along the side of the road. (1/13/10 Trial Tr. at 121-28 (Ms. Gordy's testimony); id. at 139-59 (Mr. McClure's testimony)).

In sum, habeas relief is not warranted on Petitioner's claim of ineffective assistance because he has not shown that trial counsel's performance was deficient nor that he was prejudiced. In addition, the state trial court's rejection of Petitioner's claims about trial counsel was neither contrary to, or an unreasonable application of, Strickland.

J.  Appellate Ineffective Assistance

In his tenth and final ground for relief, Petitioner alleges that his appellate attorney was ineffective because the attorney failed to raise meritorious issues in the appeal of right and also failed to correct the pre-sentence investigation report.  The trial court rejected Petitioner's claim about appellate counsel on post-conviction review because Petitioner failed to raise any meritorious issues regarding trial counsel.

Claims of ineffective assistance of appellate counsel are governed by the same Strickland standard as claims of ineffective assistance of trial counsel. Shaneberger v. Jones, 615 F.3d 448, 452 (6th Cir. 2010).  To prevail on his claim, Petitioner "must show that his [appellate] counsel's performance was deficient and that he was prejudiced as a result."  Id. (citing Strickland, 466 U.S. at 687).  He must demonstrate (1) that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability that he would have prevailed on appeal if his attorney had raised the issues.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. at 687-91, 694).

The claims that appellate counsel failed to raise on direct appeal (denial of the right to present a defense, certain prosecutorial misconduct, mishandling of evidence, and ineffective assistance of counsel) lack merit for the reasons given above. Therefore, appellate counsel was not ineffective for failing to raise the claims on appeal. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."  Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001).

Petitioner asserts that appellate counsel was ineffective for an additional reason: he failed to have the pre-sentence investigation report modified to correct the statement that Deana Gordy and Charles McClure observed Petitioner walking away from a burning truck.  Trial counsel, however, raised this issue at Petitioner's sentencing, and the trial court with Petitioner that Gordy and McClure never identified Petitioner.  The Court agreed to strike the information from the pre-sentence report.  (2/23/10 Sentencing Tr. at 6.)  Appellate counsel was not ineffective for failing to raise a moot issue.  Petitioner is not entitled to relief on this claim.

## VI.  Conclusion

For the reasons stated above, the state courts' opinions were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable determinations of the facts.  Accordingly, the petition is DENIED.

Further, a certificate of appealability is DENIED because reasonable jurists could not debate whether the petition should have been resolved differently or whether the issues deserve encouragement to proceed further.

Slack v. McDaniel, 529 U.S. 473, 484 (2000).

SO ORDERED.

s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  August 30, 2017
Detroit, Michigan